```
                 THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                        FORT PIERCE DIVISION

                    CASE NO.:  21-mj-00019-SMM-1




UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )        April 5, 2021
v.                             )
                               )
RONELL BERNARAD BRYANT III,    )
                               )        Pages 1 - 15
            Defendant.         )
_____/




                         EXCERPT OF HEARING

              (Testimony of Luciana Knight via Zoom)

              BEFORE THE HONORABLE SHANIEK M. MAYNARD
                    UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

On behalf of the Plaintiff:

                   UNITED STATES ATTORNEY'S OFFICE
                   101 S. U.S. Highway 1
                   Fort Pierce, FL 34950
                   BY:  DANIEL E. FUNK, AUSA
```

```
 1
    APPEARANCES CONTINUED:
 2

 3  On behalf of the Defendant:

 4                      PERLET, SHINER, P.A.
                        515 North Flagler Drive
 5                      Suite 701,
                        West Palm Beach, FL 33401
 6                      BY:  PAUL J. WALSH, ESQ.

 7

 8

 9

10  Transcribed By:

11                      BONNIE JOY LEWIS, R.P.R.
                        7001 SW 13 Street
12                      Pembroke Pines, FL  33023
                        954-985-8875
13                      caselawrptg@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

THE WITNESS:                                              PAGE:

**LUCIANA KNIGHT**

Direct Examination by Mr. Walsh:                           10

Cross Examination by Mr. Funk:                             11

```
 1                (Thereupon, the following proceeding was held:)
 2                THE COURTROOM DEPUTY:  All right.  This is the matter
 3   of United States versus Ronell Bernard Bryant III.  This is
 4   Case Number 21-cr-19-SMM.
 5                Could I have the parties' appearances, please,
 6   beginning with counsel for the Government.
 7                MR. FUNK:  Good morning, Your Honor.  Daniel Funk on
 8   behalf of the United States.
 9                THE COURT:  Good morning.
10                MR. WALSH:  Good morning, Your Honor.  Paul Walsh on
11   behalf of Ronell Bryant.
12                THE COURT:  Good morning, Mr. Walsh.
13                And good morning, Mr. Bryant.
14                THE DEFENDANT:  Good morning, ma'am.
15                THE COURT:  For the record, could I also have an
16   appearance from the Pretrial Services Officer?
17                U.S. PROBATION:  Good morning, Your Honor.  Nathan
18   Vreeland U.S. Probation.
19                THE COURT:  Good morning.
20                Okay.  We are here for a detention hearing.
21                Mr. Walsh, are we proceeding with the hearing today,
22   sir?
23                MR. WALSH:  Yes, Your Honor.
24   (Thereupon, Luciana Knight's testimony was heard:)
25                THE COURT:  Okay.  Mr. Walsh, you were going to
```

present evidence through Mr. Bryant's mom.

        MR. WALSH:  It's his mother.  I don't know if the Court wants to swear her in first.

        THE COURT:  Yes, ma'am.

        If you would raise your right hand so you could be sworn in by the Courtroom Deputy.

        THE WITNESS:  Yes, ma'am.  (Complied.)

(Witness sworn.)

        THE COURTROOM DEPUTY:  Please state your name.

        THE WITNESS:  Luciana Knight.

        THE COURTROOM DEPUTY:  And spell your first and last name.

        THE WITNESS:  Luciana, L-U-C-I-A-N-A Knight; K-N-I-G-H-T.

        THE COURTROOM DEPUTY:  Thank you.

        THE COURT:  Counsel, you may inquire.

        MR. FUNK:  Thank you, Your Honor.

        LUCIANA KNIGHT, DEFENSE WITNESS SWORN

DIRECT EXAMINATION

BY MR. WALSH:

Q.  Miss Knight, can you tell the Court how you know Ronell Bryant?

A.  **That is my son; firstborn son.**

Q.  And do you have any other children other than Ronell?

A.  **Yes, sir.  Zionte (phonetic); 21.**

```
 1  Q.   And that's your other son?
 2  A.   Yes, sir.
 3  Q.   Okay.  And where do you live, ma'am?
 4  A.   3706 Avenue K, for the Fort Pierce, Florida 34947.
 5  Q.   And how long have you lived there?
 6  A.   20 something years.
 7  Q.   Okay.  Was Ronell born and raised in that home?
 8  A.   Yes, sir.
 9  Q.   Okay.  Has he lived Fort Pierce most his life?
10  A.   Yes, sir.
11  Q.   Is the majority of his extended family from that area or in
12  that area?
13  A.   Yes, sir.
14  Q.   Okay.  Obviously you are familiar with the events of
15  July 9th when law enforcement executed a search warrant on your
16  home?
17  A.   Yes, sir.
18  Q.   You gave police permission to enter your home that day,
19  correct?
20  A.   Yes, sir.
21  Q.   I'm sorry?
22  A.   Well, actually, when I got there they told me I couldn't go
23  inside of my home because the house was being -- whatever they
24  said for a search warrant.  So I was saying what's my house got
25  to do with it, you know.
```

1  Q.   Right.
2  A.   **And I said, well, I have to see if my godson is in my house**
3  **because I left him there -- well, I actually to meet me there.**
4  **I left the back door open for him to come in.**
5  Q.   Understood.
6       After speaking with law enforcement and being brought up to
7  speed, you agreed to give them consent to search the home,
8  correct?
9  A.   **They was already in.  So let them search.**
10 Q.   Okay.  And at that time, during that time in July of 2020,
11 was Ronell living at that home with you?
12 A.   **No, sir.**
13 Q.   Okay.  Who was living at that home on a nightly basis, on
14 an every night basis?
15 A.   **Yes.  Asiana (phonetic).**
16      **My cousin Earnest Knight lives there.  Him and his**
17 **girlfriend was going through things so I let them stay there**
18 **for a while.**
19      **Previous to that my brother Octavia Tash (phonetic) was**
20 **living there until he got his place in Port St. Lucie.**
21 Q.   Was Ronell, for lack of a better word, on the road a lot
22 during that time?
23 A.   **Yes, sir.**
24 Q.   Is that part of his profession where he travels --
25 A.   **Yes.**

```
 1  Q.   -- for work?
 2  A.   Yes, sir.
 3  Q.   Would he stay on that residence on a weekly or nightly
 4  basis with you at 3706 Avenue K?
 5  A.   No, sir.
 6  Q.   Okay.  There was some firearm and ammunition found in the
 7  bedroom as far as banana clips located in a Crown Royal bag.
 8       Are you familiar with that ammunition?
 9  A.   Yes, sir, I am.
10       I explained to the officer everything that I owned.  I told
11  him I had two fully loaded clips back there.  I told him they
12  was in the -- back there in the room with my gun safe.  My gun
13  safe is also in that second back room on the floor on your
14  right-hand side.
15  Q.   But, specifically, those banana clips with the ammunition,
16  did that belong to you?
17  A.   Yes, sir.
18  Q.   Okay.  And there was another firearm, I believe, located on
19  your bed; a .9 millimeter.
20       Did that belong to you as well?
21  A.   Yes, sir.
22  Q.   And just so the Court is aware, are you a licensed
23  firearm --
24  A.   Yes, I am.
25  Q.   -- carrier?
```

1        You have CCW?
2   A.   **Yes, I am, sir.**
3   Q.   Okay.
4   A.   **I had two.  I keep one personally on me.**
5        **That's the one I told him I left under my pillow and then I**
6   **put one right inside of my closet on the floor.**
7   Q.   There was some testimony also about a box with for an FN
8   firearm that was registered to an Ernest Knight.
9        Is that the same Ernest Knight that you mentioned
10  occasionally --
11  A.   **Yes.**
12  Q.   -- stayed with you at that home?
13  A.   **Yes, sir.**
14  Q.   Okay.  Would he stay there sporadically, or was it here and
15  there, or how often would he stay there?
16  A.   **I mean, him and his baby mama, they always going through**
17  **something.  Instead of him getting in trouble, I would always**
18  **tell him he could come there.  So he had been there.**
19       **And then, you know, he would leave because he doesn't**
20  **really -- he works in -- out of town.  So, like, he's working**
21  **most of the day and most of the night and then he comes back.**
22  Q.   Does Ronell still receive some mail or junk mail at that
23  residence?
24  A.   **Every blue moon he may get some junk mail.**
25  Q.   Okay.  On the day, July 9th, that this all happened, do you

1  recall if Ronell and Mr. Shane Cole spoke with you or met with
2  you prior to going to the home?
3  A.   **Yes, sir.**
4  Q.   Do you know why they did that?
5  A.   **Yes, sir.**
6       **I was driving the manager's car that day and they was**
7  **getting ready to come back down.  And they asked me where I was**
8  **because they changed his car and he needed to be dropped off**
9  **because Ronell was waiting to go home.**
10      **They came to the store.  Shane Cole came to the store where**
11 **I was.  He met me.  He got my house keys and they went and**
12 **proceeded to the house.**
13 Q.   Did they need your house keys to get into the home?
14 A.   **Yes, sir.**
15 Q.   So Ronell does not have a set of his own keys to that home?
16 A.   **No, sir.**
17 Q.   Okay.  Is it after that point when you learned the police
18 had arrested Ronell and were at the home?
19 A.   **Yes, sir.**
20      **My neighbor started calling me and they told me that the**
21 **police had my house surrounded and they was picking up my son.**
22      **So I was, like, for what?  I left everything and went**
23 **running to see what was going on.**
24      **When I pulled up I heard somebody say there go the mom,**
25 **there go the mom.  And I seen an officer coming out of my back**

1  door, like, closing the door.
2  Q.   And the officers indicated when they searched the home that
3  there were multiple male clothing items in the same bedroom as
4  the FN box.
5       Do you know whose clothes those are?
6  A.   Yes, sir.
7  Q.   Whose are they?
8  A.   I could -- can you repeat yourself.  I couldn't hear you.
9  Q.   If you know, whose clothes are they, please?
10 A.   Oh, yes, sir.  My son's Zionte Bryant.
11 Q.   And does he live there currently?
12 A.   Not at this moment, but his clothes are there.
13 Q.   Where is your other son?
14 A.   He's currently incarcerated.
15 Q.   Okay.  Are you keeping his belongings there until he gets
16 released?
17 A.   Yes, sir.
18 Q.   Okay.
19          MR. WALSH:  Okay.  I don't have any further questions,
20 Your Honor?
21          THE COURT:  Any questions, Mr. Funk?
22                      CROSS EXAMINATION
23 BY MR. FUNK:
24 Q.   Miss Knight, prior to July 9th of 2020, when was the last
25 time that Mr. Bryant had lived at the residence or had been at

1 the residence, for that matter?
2 A.  **Well, the last time he had been there was maybe four or**
3 **five days he stopped by and told me that he was getting ready**
4 **to go down south.**
5 Q.  That's before he went down to do a music video in Fort
6 Lauderdale?
7 A.  **Yes.**
8 Q.  And you said that you are familiar with the room because
9 you recognize some of the clothing that was in the room; is
10 that correct?
11 A.  **Yes, sir.**
12 Q.  What is your son's profession?
13 A.  **My son is a rapper.**
14 Q.  Okay.  Within the room --
15 A.  **An entertainer.**
16 Q.  Within the room there is also recording equipment, right?
17 A.  **Yes, sir.**
18 Q.  There was on July 9th?
19 A.  **Yes, sir.  That's old equipment he had.**
20 Q.  Okay.  And would it be consistent with his room if there
21 was medication that was found in there, pill bottles for your
22 son, Ronell?
23 A.  **Well, right now, sir, I was in the process of -- my house**
24 **is cluttered because I was buying a lot of things because I'm**
25 **getting ready to get a bigger house.  So I have all sorts of**

1 **stuff around the house.**
2 Q. Okay. Would it be consistent with being his room if there
3 was rap lyrics that was also found in the room?
4 A. **No, sir. Because everything was pushed out of the first**
5 **room and everything was pushed into that room. That's like a**
6 **spare room.**
7 Q. Which room do you mean the spare room?
8 A. **The second; the second room.**
9 Q. Let's talk about the layout of your house. Starting first
10 if we were both standing --
11         THE COURT: Mr. Funk?
12         MR. WALSH: Yes.
13         THE COURT: I think you're going too far afield into
14 the specifics of her house and that sort of thing.
15         I only need to consider the strength of the
16 Government's case, but for purposes of this hearing, I am
17 primarily interested -- well, solely interested in danger to
18 the community and risk of flight.
19         So I don't think we need to talk about the layout of
20 her house right now.
21         MR. FUNK: I would like to touch on an issue of
22 credibility with the witness and it does involve her
23 identification of where Mr. Bryant stayed in the house.
24         I believe that she identified for the law enforcement
25 officers that there was a bedroom, the first bedroom to the

1  left that she identified as being his.
2          THE WITNESS:  No, that's --
3          THE COURT:  Wait, wait, wait, wait.  Miss Knight, we
4  don't talk over each other in court.
5          THE WITNESS:  Oh.
6          THE COURT:  I'm going to hear from Mr. Funk and then
7  I'm going to decide as to whether I am going to let him go into
8  this questioning.
9           Go ahead, Mr. Funk, briefly.
10         MR. FUNK:  I believe that she identified a bedroom for
11 law enforcement, which is inconsistent with where Mr. Bryant
12 would have resided in the house.
13         THE COURT:  Well, she said Mr. Bryant didn't live
14 there.
15         MR. FUNK:  He would have kept his belongings or spent
16 time when he stayed.
17         THE COURT:  No, I'm not going to let you go into that
18 right now.
19         MR. FUNK:  Okay.  If I could have one moment, Your
20 Honor?
21         THE COURT:  You may.
22         MR. FUNK:  That's all the questions I have, Judge.
23 Thank you.
24         THE COURT:  Okay.  Anything else with this witness,
25 Mr. Walsh?

```
 1              MR. WALSH:  No, Your Honor.  Thank you.
 2              Miss Knight, if you could please log off.
 3              THE WITNESS:  Okay.  Thank you so much.
 4              THE COURT:  Well, Miss Knight --
 5              MR. WALSH:  Oh, I'm sorry.
 6              THE COURT:  You don't have to log off.
 7              If you want to hear the remainder of the hearing, you
 8   can just turn off your camera and listen in --
 9              THE WITNESS:  Okay.
10              THE COURT:  -- or you could log off if you would like
11   to.
12              THE WITNESS:  Okay.  Thank you.
13              THE COURT:  All right.
14              MR. WALSH:  I apologize, Your Honor.
15              THE COURT:  Any other evidence, Mr. Walsh?
16              MR. WALSH:  No, Your Honor.  Just argument.
17              THE COURT:  All right.  Argument, Mr. Funk and then I
18   will hear argument from Mr. Walsh.
19              (Thereupon, the proceedings concluded.)
20
21
22
23
24
25
```

```
 1
 2                         CERTIFICATE
 3
 4       I hereby certify that the foregoing transcript is an
 5  accurate transcript of the audio recorded proceedings in the
 6  above-entitled matter.
 7
 8
 9
10
    04/23/21                    Bonnie Joy Lewis,
11                        Registered Professional Reporter
                             CASE LAW REPORTING, INC.
12                          7001 Southwest 13 Street,
                           Pembroke Pines, Florida 33023
13                                954-985-8875
14
15
16
17
18
19
20
21
22
23
24
25
```