1      THE UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF FLORIDA
2
       FORT PIERCE DIVISION
3
       CASE NO.:  21-cr-14017-AMC
4

5

6

7   UNITED STATES OF AMERICA,      )
                                   )
8              Plaintiff,          )        April 5, 2021
    v.                             )
9                                  )
    RONELL BERNARD BRYANT III,     )
10                                 )        Pages 1 - 72
               Defendant.          )
11  _____/

12

13

14
                      DETENTION HEARING
15
       BEFORE THE HONORABLE SHANIEK M. MAYNARD
16          UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21  APPEARANCES:

22
    On behalf of the Plaintiff:
23
                   UNITED STATES ATTORNEY'S OFFICE
24                 101 S. U.S. Highway 1
                   Fort Pierce, FL 34950
25                 BY:  DANIEL E. FUNK, AUSA

```
 1
     APPEARANCES CONTINUED:
 2

 3   On behalf of the Defendant:

 4                        PERLET, SHINER, P.A.
                          515 North Flagler Drive
 5                        Suite 701,
                          West Palm Beach, FL 33401
 6                        BY:  PAUL J. WALSH, ESQ.

 7

 8

 9

10   Transcribed By:

11                        BONNIE JOY LEWIS, R.P.R.
                          7001 SW 13 Street
12                        Pembroke Pines, FL  33023
                          954-985-8875
13                        caselawrptg@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2
      THE WITNESS:                                    PAGE:
3

4     **ATF AGENT SETH CHRISTY**

5
      Direct Examination by Mr. Funk:                  10
6
      Voir Dire Examination by Mr. Walsh:              13
7
      Continued Direct Examination by Mr. Funk:        15
8
      Cross Examination by Mr. Walsh:                  33
9
      Redirect Examination by Mr. Funk:                44
10

11

12

13    **LUCIANA KNIGHT**

14
      Direct Examination by Mr. Walsh:                 50
15
      Cross Examination by Mr. Funk:                   56
16

17

18

19

20

21

22

23

24

25

4

1              (Thereupon, the following proceeding was held:)

2              THE COURT:  All right.  This is the matter of United

3    States versus Ronell Bernard Bryant III.  This is Case Number

4    21-19-SMM.

5              May I have the parties' appearances, please, beginning

6    with counsel for the Government.

7              MR. FUNK:  Good morning, Your Honor.  Daniel Funk on

8    behalf of the United States.

9              THE COURT:  Good morning.

10             MR. WALSH:  Good morning, Your Honor.  Paul Walsh on

11   behalf of Ronell Bryant.

12             THE COURT:  Good morning, Mr. Walsh.

13             And good morning, Mr. Bryant.

14             THE DEFENDANT:  Good morning, ma'am.

15             THE COURT:  For the record, can I also have an

16   appearance from the Pretrial Services Officer?

17             U.S. PROBATION:  Good morning, Your Honor.  Nathan

18   Vreeland, U.S. Probation.

19             THE COURT:  Good morning.

20             Okay.  We are here for a detention hearing.

21             Mr. Walsh, are we proceeding with the hearing today,

22   sir?

23             MR. WALSH:  Yes, Your Honor.

24             THE COURT:  Okay.  All right.  First let me address

25   Mr. Bryant.  As we talked about last week, Mr. Bryant.  We are

1  conducting these hearings by videoconference because of the
2  COVID-19 public emergency.
3          If you have any issues whatsoever with technology, you
4  can't hear or see me, or your screen freezes up, let the
5  Detention Officer know and we will get it addressed.  Because
6  the purpose really is to make sure you understand everything
7  happening with the hearing, okay?
8          THE DEFENDANT:  Yes, ma'am.
9          THE COURT:  All right.  Now, I do need to ask you,
10  sir, do you consent to allow us to conduct this hearing by
11  videoconference today?
12          THE DEFENDANT:  Yes, I do.
13          THE COURT:  Okay.  And remember, if you need to speak
14  with your lawyer at any time, I can also create a virtual
15  breakout room for you to talk with him, okay?
16          THE DEFENDANT:  Yes, ma'am.
17          THE COURT:  All right.  And if you need to say
18  something, just let me know and I will just create a breakout
19  room so you can tell him what you would like to say.
20          Because sometimes when people speak out in court, they
21  could hurt their case without really realizing it, okay?
22          THE DEFENDANT:  Yes, ma'am.
23          THE COURT:  All right.  Mr. Walsh, do you have a copy
24  of the complaint and the Pretrial Services Report?
25          MR. WALSH:  Yes, Your Honor.

```
 1            THE COURT:  Do you have any objection to the Court
 2   relying on those documents for purposes of this hearing only?
 3            MR. WALSH:  No, Your Honor.
 4            THE COURT:  All right.  Mr. Funk, do you have any
 5   objection, sir?
 6            MR. FUNK:  I do not.
 7            THE COURT:  All right.  You may proceed, Mr. Funk.
 8            MR. FUNK:  Your Honor, the Government is seeking
 9   detention based on danger to the community.
10            Agent Christy is available for cross-examination.  He
11   is the one who swore out the complaint originally and after I
12   -- would you like me to read through the probable cause that is
13   contained in the complaint?
14            THE COURT:  Yes, you can.
15            You can summarize it.  You don't have to read it all,
16   but certainly summarize it for the record and for Mr. Bryant
17   and myself.
18            MR. FUNK:  Yes, ma'am.
19            On July 9th of 2020, Ronell Bryant III, also known as
20   Little Polo DeDawn and Polo Bryant (phonetic), was arrested
21   based on state arrest warrant outside of his mother's residence
22   located here in Fort Pierce, St. Lucie County Florida.  Ronell
23   Bryant was found sitting in the driver's seat a leased Nissan
24   Sedan parked in the yard of a residence.
25            On scene Agent Christy spoke with LK, the mother of
```

1  Mr. Bryant, and got consent to search the residence.  Once

2  contraband was observed in the residence, a search warrant was

3  obtained for both the Nissan Sedan as well as the residence.

4        During the search of the Nissan Sedan, from which

5  Ronell Bryant was removed and taken into custody, law

6  enforcement agents located a bag containing one loaded FN

7  Hurstal 57 pistol.  Within the bag where the FN pistol 57

8  pistol was found, law enforcement also found a receipt with

9  Ronell Bryant's name on it and clothing.

10        The pistol and 5.7 by 28 millimeter ammunition were

11  manufactured outside the State of Florida and, therefore, it

12  traveled in interstate or foreign commerce.  During a search of

13  the house inside a bedroom believed to be Bryant's, deputies

14  located a box for the FN Hurstal 57 pistol bearing the same

15  serial number.

16        Within the bedroom --

17        THE COURT:  I'm sorry to interrupt you, but I got

18  distracted.  Where did you say the pistol was located and the

19  receipt?

20        MR. FUNK:  It was located in a bedroom that was

21  believed to be used by Ronell Bryant.

22        THE COURT:  Okay.

23        MR. FUNK:  Within that bedroom there was also AK style

24  magazines in 7.62 by 39 millimeter ammunition.

25        Also located were business mail bearing Bryant's name,

1  photographs of Bryant, men's clothing, and court paperwork and

2  several prescription bottles bearing Bryant's name.

3          In the closet of the bedroom, deputies also found a

4  purchase receipt for the FN Hurstal 57 pistol.  The receipt was

5  from the Indian River Sportsman and Target Range in Vero Beach.

6  The purchaser was identified as EK, who is the cousin of

7  Bryant.

8          After the search was conducted, Agent Christy went to

9  the Indian River Sportsman and Target Range and found a Form

10  4473 completed by Bryant's cousin dated April 9th of 2020.

11          On July 13th of 2020, Deputy Stotler (phonetic)

12  obtained a search warrant for the cell phone confiscated from

13  Bryant after his July 9th, 2020, arrest.  The contents were

14  downloaded and several photographs were located showing Bryant

15  in possession of firearms.

16          One of the photographs depicts what appears to be

17  Mr. Bryant holding an FN Hurstal 57 pistol, the frame, plating,

18  trigger guard, trigger rail system and slide were all observed

19  and consistent with it being that type of firearm.

20          In the photograph Bryant was using what Agent Christy

21  believed to be a Bloods Street gang hand sign.

22          Within the probable cause affidavit there's an image

23  that shows what I just described.

24          A second photograph, also depicting Bryant with what

25  appears to be an FN Hurstal 57 pistol sticking out of his right

9

1    pocket was also located.  A close-up of the photographs shows

2    the grip slide, rear slide, grip stripping, the texture

3    pattern, and a magazine floor plate that can be clearly seen.

4    That's consistent with what was found in the vehicle.

5          There were text messages between Bryant and an

6    individual named in the communications, Chance the shooter,

7    dated July 8th of 2020.  There was a drop-box link that went to

8    an image.  That image is included in the original probable

9    cause affidavit and shows the Defendant holding an FN Hurstal

10   57 pistol and FN S-9 contact .9 millimeter pistol.

11         During his post Miranda interview, Bryant commented

12   that he had recently been in Broward County shooting a music

13   video.  And Agent Christy believes that that image that is

14   contained within the probable cause affidavit was for that same

15   video shoot.

16         Bryant was convicted of a felony on February 14th of

17   2019.  He was adjudicated guilty for the felony offense of

18   carrying a concealed firearm in the State of Florida and

19   sentenced to 11 months and 29 days of imprisonment.

20         And I do have some testimony and exhibits to present

21   through Agent Christy.  If I could proceed with that?

22         THE COURT:  Absolutely.  Agent, if you could turn on

23   your video.

24         THE WITNESS:  Good morning, ma'am.

25         THE COURT:  Good morning, Agent.

```
 1            If you could raise your right hand and be sworn in by
 2   the courtroom deputy.
 3            THE WITNESS:  (Complied.)
 4   (Witness sworn.)
 5            THE COURTROOM DEPUTY:  Please state your name and then
 6   spell your last name for the record.
 7            THE WITNESS:  Seth Christy; last name spelled
 8   C-H-R-I-S-T-Y.
 9            THE COURTROOM DEPUTY:  Thank you.
10            THE COURT:  Mr. Funk, you may inquire.
11            MR. FUNK:  Thank you.
12            ATF AGENT SETH CHRISTY, GOVERNMENT'S WITNESS SWORN
13                        DIRECT EXAMINATION
14   BY MR. FUNK:
15   Q.  Agent, where do you work?
16   A.  I worked for the Alcohol Tobacco and Firearms; ATF for
17   short.
18   Q.  For how long have you worked for -- sorry about that
19   overlap.
20   A.  No problem.  Almost five years now.
21   Q.  Where did you work before that?
22   A.  I was a Special Agent with the State of Florida Division of
23   Alcohol Beverages and Tobacco.
24   Q.  How long did you work there?
25   A.  Approximately three years.
```

1  Q.   At the time that you had been working for ATF what had been

2  your responsibilities and duties?

3  A.   **Since my time here I investigated most aspects of violent**

4  **crime.   Including firearm trafficking, illegal firearms**

5  **possession, the illegal transfer of firearms, drug trafficking,**

6  **amongst other violations of United States Code.**

7  Q.   And did you conduct an investigation into an individual by

8  the name of Ronell Bryant?

9  A.   **Yes, sir.**

10 Q.   When did that begin?

11 A.   **It began early July of 2020.**

12 Q.   As a part of that were you involved in a search warrant

13 that occurred on July 9th of 2020?

14 A.   **Yes, sir.**

15 Q.   Okay.   Now, was everything that I read in the affidavit

16 accurate?

17 A.   **Yes.   I do believe just when you were describing the**

18 **firearm, I believe the Judge was confused about one of the**

19 **things.   The firearm was actually found in the trunk of the**

20 **vehicle.   The box was found in the bedroom that we believe**

21 **belonged to Ronell Bryant.**

22      **I just want to clarify that.**

23 Q.   I appreciate that.   Thank you.

24 A.   **No problem.**

25 Q.   As a part of your investigation into Mr. Bryant, did you

1   download the phone?

2   A.   **Yes.**

3   Q.   When you downloaded the phone, did you see images there of

4   Mr. Bryant in possession of drugs and firearms?

5   A.   **Yes, I did.**

6   Q.   As a part of that investigation, did you retain images of

7   those drugs and firearms?

8   A.   **Yes.**

9   Q.   Did you also -- what appears to Mr. Bryant's profession

10  musically?

11  A.   **He's a rapper; a musician.**

12  Q.   Does his videos, do they get uploaded to YouTube?

13  A.   **Yes.  Yes, they do.**

14  Q.   As part of your investigation, did you retain images of the

15  videos what were uploaded to YouTube?

16  A.   **Yes.  I downloaded and retained most of his music videos.**

17  Q.   Did you download one titled 29 Dawn?

18  A.   **Yes.**

19  Q.   Was Mr. Bryant the main singer in that video?

20  A.   **Yes.**

21  Q.   Did you have an opportunity to review the video?  You would

22  recognize it if you saw it again, right?

23  A.   **Yes.  I've reviewed the video numerous times.**

24            MR. FUNK:  Okay.  Your Honor, at this time I will move

25  into evidence what has been marked as Government's Exhibit

13

1   Number 1.  It's a video of 29 Dawn.

2           THE COURT:  Any objection, Mr. Walsh?

3           MR. WALSH:  Judge, I would just object to see if the

4   agent can testify -- I don't know if he may be able to -- if he

5   knows the date that video was created as far as it would be

6   relevant to the felon in possession.

7           THE COURT:  You may inquire, Mr. Walsh.

8                    VOIR DIRE EXAMINATION

9   BY MR. WALSH:

10  Q.   Good morning, Agent Christy.

11  A.   **Good morning, sir.**

12  Q.   I understand that you uploaded the videos that you were

13  referring to was downloaded from YouTube; is that correct?

14  A.   **That is correct, sir.**

15  Q.   Do you have any evidence of the date that video was

16  actually created?

17  A.   **Not evidence of the date that it was created, *per se*.**

18      **I do have the date timestamp that it was uploaded to**

19  **YouTube, which was on January 13th of 2020.**

20  Q.   Do you have any evidence that would prove that the video

21  was created after February 14th of 2019, the date that Mr.

22  Bryant was actually a convicted felon?

23  A.   **Not offhand.  However, there are several videos of**

24  **interviews that Mr. Bryant took part in as part of furthering**

25  **his musical career and they are also on YouTube and available.**

1    **And in one of those videos he does talk about recently**

2  **being released from prison and completing several music videos.**

3  **So that has also been retained as part of the case file.**

4  Q.   But, specifically, as it relates to Dawn 29, do you have

5  any evidence that would prove that video was created subsequent

6  to February 14th of 2019?

7  A.   **At this time I don't have metadata to produce that would**

8  **show the creation date and time.**

9  Q.   Understood.  Thank you.

10        MR. WALSH:  The Defense would object to the video as

11  far as relevance and improper foundation as far as proving

12  whether or not Mr. Bryant was a convicted felon at the time.

13        THE COURT:  Response, Mr. Funk?

14        MR. FUNK:  I'm sorry, Your Honor.  One moment.

15        THE COURT:  Sure.

16        MR. FUNK:  Your Honor, we are proceeding on the basis

17  of danger to the community and we're not trying to prove that

18  there is a particular date or charge.

19        We are trying to show that Mr. Bryant is a danger to

20  the community because of his repeated possession of a firearm.

21  In the date it comes from the early part of 2020, which was

22  between the time period he was convicted obviously and the time

23  period that he was arrested.

24        We are not proving beyond a reasonable doubt, but we

25  believe the Court should take into consideration what the

1  images depict in the 29 Dawn video, which is his gang

2  associations as well as his possession of a firearm.

3          THE COURT:  Okay.  I've heard both parties on this.

4          I am going to not admit the video.  I understand the

5  Government's argument.  I see your point, but I do think that

6  Mr. Walsh has established that you can't demonstrate, at least

7  at this point, that he was a felon when he had whatever gun,

8  which I'm assuming he had in the video.  And so if he wasn't a

9  felon when he had the gun, then it wouldn't necessarily be

10  illegal for him to have the gun.

11          And since the charge here is felon in possession, I

12  just think it is a little too entangled for me to really look

13  at the video if you don't know if, in fact, he was a felon when

14  he had the video.

15          So I am not going to watch the video.  But, Mr. Funk,

16  you can certainly make whatever argument you like when it comes

17  to arguing danger.

18          Go ahead, Mr. Funk.

19                    DIRECT EXAMINATION CONTINUED

20  BY MR. FUNK:

21  Q.  Were there other images, Agent Christy, when you saw

22  Mr. Bryant in possession of firearms or what appeared to be

23  firearms?

24  A.  **From his phone?**

25  Q.  Correct.

1  A.   **Yes, there were multiple images of him with firearms.**

2  Q.   And let me --

3         MR. FUNK:   If I could have one moment, Your Honor.

4  BY MR. FUNK:

5  Q.   Okay.  Were you able to find on YouTube a video titled 2021

6  Flow?

7  A.   **Yes.**

8  Q.   And within that image were you able to see people wearing

9  masks?

10 A.   **Yes.**

11 Q.   Where was that in the video?

12 A.   **It's kind of like a montage of different type of videos all**

13 **wrapped into one, but it is obvious that it takes place after**

14 **the COVID-19 pandemic with the masks being worn consistently.**

15 Q.   Does that montage show Mr. Bryant in what appears to be a

16 firearm?

17 A.   **Yes.**

18 Q.   And is he also in that video with another individual that

19 is identified as Willie Irving?

20 A.   **Yes.**

21 Q.   Is Willie Irving a juvenile or an adult?

22 A.   **Willie Irving, Jr. is a juvenile.**

23 Q.   And in the 2021 Flow video that you recovered, are there

24 date stamps and times on the other images which are within the

25 video?

1  A.   **Date, stamps, and times?**

2  Q.   Right.

3  A.   **I don't recall if there are specific dates and times.  I**

4  **just recall the date that it was uploaded.**

5  Q.   Okay.  What was of the date that it was uploaded?

6        THE COURTROOM DEPUTY:  Pardon me, Your Honor.

7        This is Colette.  St. Lucie Jail lost connection for

8  one moment and now they are reconnecting.  So please bear with

9  us.

10        THE OFFICER:  I apologize, Your Honor.  We had some

11  technical difficulties, but we're back.

12        THE COURT:  Okay.  Thank you, sir.

13        All right.  Mr. Bryant, you can see and hear us,

14  correct?

15        THE DEFENDANT:  Yes, ma'am.

16        THE COURT:  Okay.  Counsel, you were inquiring as to

17  whether there were time stamps on the 2021 Flow video.  You may

18  continue.

19        MR. FUNK:  Okay.

20  BY MR. FUNK:

21  Q.   And were there time stamps on some of the images that were

22  in the 2021 Flow video?

23  A.   **I don't recall specific time stamps, no.**

24  Q.   Okay.  And is Ronell Bryant in the images with an

25  individual by the name of Willie Irving?

1  A.  **Yes.**

2  Q.  Do you know Willie Irving's date of birth or whether or not

3  he is an adult or a juvenile?

4  A.  **He was born in 2004.  So he's a juvenile.  He just turned**

5  **17.**

6  Q.  And have you had an opportunity to review still images that

7  were taken from that video?

8  A.  **Yes.**

9       MR. FUNK:  Your Honor, at this time I would like to

10  publish or show Agent Christy what has been marked as

11  Government's Exhibit Number 13.

12       THE COURT:  Well, if you publish it, then I would be

13  able to see it.

14       So, Mr. Walsh, any objection to the admission of this

15  exhibit?

16       MR. WALSH:  Judge, I would have the same objection

17  that if it can't be established that the photograph was taken

18  subsequent to Mr. Bryant being a convicted felon, then the

19  Defense would object.

20       THE COURT:  Okay.  And I believe I heard evidence that

21  there were people in this video wearing masks, correct, Mr.

22  Funk?

23       MR. FUNK:  Yes, ma'am.

24       THE COURT:  Okay.  I am going to admit this video

25  because masks really just came into fashion during the COVID-19

```
 1  public emergency, which was after he became a convicted felon.
 2  So we'll go ahead and admit this video over Mr. Walsh's
 3  objection.
 4          You may proceed, Mr. Funk.
 5          MR. FUNK:  And if I could press share screen and I
 6  will open the file.
 7          THE COURT:  Miss Griffin-Arnold, can he share his
 8  screen?
 9          THE COURTROOM DEPUTY:  Yes, he should be able to share
10  his screen.
11          THE COURT:  Okay.  There we go.
12          MR. FUNK:  Okay.
13  BY MR. FUNK:
14  Q.  Agent Christy, is this a moving image or a still image in
15  the video?  Let me ask a clearer question.
16          THE COURT:  Mr. Funk, I'm looking at a lot of
17  pictures.  I don't want to see all these pictures.  I just want
18  to see whatever it is that is in this exhibit.
19          MR. FUNK:  I'm sorry, Your Honor.  I guess what I'm
20  seeing on my shared screen is one single image.
21          THE COURT:  Okay.  Can you stop sharing your screen.
22          MR. FUNK:  Okay.
23          THE COURT:  And then, are you going to show us a
24  video?
25          MR. FUNK:  No, not the video.  Just still images from
```

1 the video.

2       THE COURT:  Can you pull up the one image that you

3 want to show?

4       MR. FUNK:  It appears on my screen and it says you are

5 sharing the screen.

6       THE COURT:  It is telling us we are viewing your

7 screen, but it has a bunch of thumbnails and I'm looking at a

8 number of pictures that I probably don't need to be looking at.

9       MR. FUNK:  Actually, Colette, if you could let me out

10 of the shared screen, I might be able to open up that file

11 first and that's what it would open to.

12       THE COURTROOM DEPUTY:  You need to exit out of your

13 share screen on your side.

14       MR. FUNK:  Okay.  The stop sharing?

15       THE COURTROOM DEPUTY:  Yes, there you are.

16       MR. FUNK:  Okay.  And let me try to open the

17 particular image before I open the share screen.

18        Is that the single image, Your Honor?

19       THE COURT:  Yes, it is.

20 BY MR. FUNK:

21 Q.  Okay.  All right.  Agent Christy, do you recognize who the

22 people are in that image?

23 A.  **Yes, sir.**

24 Q.  Who is that the person on the left?

25 A.  **The person on the left is Willie Irving.**

1  Q.   And do you know if he's a documented gang member?

2  A.   **Yes.  He's actually a documented leader of a gang known as**

3  **Six Way in St. Lucie County.**

4  Q.   And who do you recognize as being the person on the right

5  side of the image?

6  A.   **The person on the right is Ronell Bryant.**

7  Q.   Do you know the type of firearm that is?

8  A.   **It's a Glock style firearm.  I can't say particularly**

9  **exactly what model or generation.**

10      **However, when this video had initially been launched, I**

11  **observed it on Ronell Bryant's Instagram, which is open to the**

12  **public for viewing.  That was on or about November 8th of 2020.**

13      **Willie Irving was subsequently arrested on the 9th of**

14  **November with a Glock 23 Generation IV firearm.**

15  Q.   Did that firearm that Willie Irving was in possession

16  appear to be the same as the one that is here in Exhibit 13?

17  A.   **Yes, it appears to be the same firearm.**

18  Q.   And was that a time period in which Mr. Bryant was on bond

19  in the state case?

20  A.   **Yes, he was on bond at that time.**

21  Q.   And were there two additional still images that were taken

22  of the 2021 Flow video?

23  A.   **Yes.**

24  Q.   Does one depict Ronell Bryant with what appears to be a

25  firearm in his waistband?

1  A.  **Yes.**

2  Q.  And does the other one, Exhibit 15, show Mr. Bryant holding

3  by his belt line or crouch what appears to be a firearm?

4  A.  **Yes.  I've seen that still photo before, yes.**

5        MR. FUNK:  Okay.  Your Honor, at this time, I would

6  move into evidence what has been marked as Government's

7  Exhibits Number 14 and 15.

8        THE COURT:  Any objection, Mr. Walsh?

9        MR. WALSH:  Same objection, but based on the Court's

10  ruling I understood the holding.  Just to be clear this is from

11  the Flow video, correct Mr. Funk?

12        MR. FUNK:  That's correct.  The 2021 Flow.

13        THE COURT:  Okay.

14        MR. WALSH:  Same objection, Your Honor.

15        THE COURT:  All right.  Objection overruled based on

16  the reasons already stated on the record.

17        You may proceed, Mr. Funk.  But this time make sure

18  you just pull up your picture that you are showing me and then

19  share your screen.

20        MR. FUNK:  Yes, ma'am.  I think I have it this time.

21  I appreciate that.

22        THE COURT:  Okay.

23        MR. FUNK:  Did it work this time, Judge?

24        THE COURT:  Yes, it did.

25        MR. FUNK:  I appreciate it.  Thanks.

1  BY MR. FUNK:

2  Q.   Okay.  Agent Christy, who is the person on the right-hand

3  side?

4  A.   **The person on the right-hand side is Willie Irving.**

5  Q.   Who is the person on the left-hand side?

6  A.   **The person on the left-hand side is Ronell Bryant.**

7  Q.   And up here to the left-hand side, his hands are out.  What

8  does he appear to be doing with his right hand?

9  A.   **After reviewing this video several times, but it's hard to**

10 **see in the photo because it's a little blurry, he is exhibiting**

11 **what is a nationally recognized as a Bloods hand signal.**

12 Q.   And what is in his left hand and it looks like under the

13 belt of his pants?

14 A.   **It appears to be the grip of a Glock firearm.**

15        MR. WALSH:  And Judge, if I may just interrupt for one

16 point.

17        The Defense would object that neither person in this

18 still photograph is wearing any type of mask or personal

19 protective equipment.  Just to point that out for the record.

20        THE COURT:  Okay.  The Court sees that and is aware of

21 that on the record.

22        I just want to be aware, Mr. Funk, the testimony is

23 that these are still images from a video where people were

24 wearing masks, right?

25        MR. FUNK:  Correct, Your Honor.

24

1    And if I could proffer that obviously it is May of

2    2021 Flow, but at the end of the video there's an image of

3    other individuals wearing medical masks.  Not ski masks or

4    anything like that.  So that's why we're dating the video

5    itself to where it is in either 2020 or 2021.

6         THE COURT:  Okay.  Go ahead, Mr. Funk.

7    BY MR. FUNK:

8    Q.   And let me show you Exhibit 15.  What does that appear to

9    be around Mr. Bryant's belt line?

10   A.   **He appears to be holding a Glock style firearm with an**

11   **extended magazine.**

12   Q.   Would that have been, if it was after July 9th of 2020,

13   would that be a firearm that he was in possession of during the

14   time period that he was on release?

15   A.   **Yes.  And once again, this is a video that I observed on**

16   **his open Instagram on or about November 8th of 2020.  So this**

17   **was well after he was released on bond for state charges.**

18   Q.   Did you also find images that show that Mr. Bryant was

19   engaged in drug dealing or associated with drug trafficking?

20   A.   **Yes.**

21   Q.   When you were doing your investigation, did you obtain

22   social media in addition to obtaining the images that were

23   located on his phone that you obtained on July 9th of 2020?

24   A.   **Yes.  There was a search warrant that was conducted on his**

25   **Facebook as well as a search warrant that was conducted on his**

1  **Instagram.**

2  Q.   And from looking at the social media, as well as the

3  information that was on his phone, are you able to determine if

4  there was a time period where Mr. Bryant was participating in

5  drug trafficking?

6  A.   **Yes.  When we started observing some of the direct**

7  **messaging that was located in his Facebook between certain**

8  **individuals that were able to identify as other gang members**

9  **from the Fort Pierce area, there were multiple messages where**

10  **Mr. Bryant was being solicited for marijuana.**

11      **There was also messages between Mr. Bryant and two other**

12  **associates that we also identified were selling large**

13  **quantities of marijuana that they were receiving or**

14  **transporting from California and other parts of the country.**

15  Q.   Were there conversations amongst Mr. Bryant and other

16  individuals about traveling to Colorado?

17  A.   **Yes.**

18  Q.   And in the travels to Colorado, what kind of date range was

19  it that they were there?

20  A.   **I was able to find screen shots of rental vehicles in the**

21  **month of April of 2020.**

22  Q.   Were you also able to find images that show Mr. Bryant with

23  a firearm and large quantities of money?

24  A.   **Yes.  I was able to locate images, as you just mentioned,**

25  **both on his Instagram that was open to the public where he**

1  **posted on or about that time.  And also, within the phone, saw**

2  **also observed those same photographs.**

3  Q.   Did you also find images of Mr. Bryant being close to large

4  quantities of marijuana around the same time period in the

5  beginning of 2020?

6  A.   **Yes.  Within the same string of photos in the phone**

7  **extraction report, there were images of Mr. Bryant around large**

8  **quantities of suspected marijuana.**

9  Q.   So for Exhibit 16, are you familiar with a photograph that

10 shows -- or an image that shows Mr. Bryant laying next to a

11 large quantity of marijuana?

12 A.   **Yes.**

13 Q.   Was that image, does that come from the time period of

14 early 2020?

15 A.   **Yes.**

16 Q.   How do you know?

17 A.   **It was captured within the cellular phone within a string**

18 **of other photographs, which both I was able to see what date**

19 **they were uploaded to Instagram.**

20    **But, also, I was able to see some of the other photos that**

21 **he had around the same time, which were tagged to Rocky**

22 **Mountain National Park in Colorado.**

23         MR. FUNK:  Your Honor, at this time I would move into

24 evidence what has been marked as Government's Exhibit

25 Numbers 16 and 17.

```
 1              THE COURT:  Mr. Walsh?
 2              MR. WALSH:  No objection based on the testimony, Your
 3   Honor.
 4              THE COURT:  Okay.  Exhibits 16 and 17 are admitted.
 5   You may publish.
 6              MR. FUNK:  Can you see the image, Your Honor?
 7              THE COURT:  Yes.
 8   BY MR. FUNK:
 9   Q.   Agent Christy, what does that image depict in Government's
10   Exhibit Number 16?
11   A.   It appears to me that Ronell Bryant is laying next to a
12   cardboard box that is filled with bags of suspected marijuana.
13   Q.   Was the date this image was taken and the series of images,
14   was that around the time where there were discussions about
15   traveling to Colorado?
16   A.   Yes.
17   Q.   And I'll show you Government's Exhibit Number 17.  What
18   does that image show?
19   A.   So this image is one of the photos that I observed on his
20   Instagram of him and two other individuals at Rocky Mountain
21   National Park.
22        Bryant is over to the far right wearing a red winter hat
23   and holding what appears to be a Micro Jerico 762 pistol.
24   There's a large quantity of cash that they are displaying on
25   the ground.  And also, the two individuals on the left were
```

1  identified as Demetrius Smith to the far left.

2      And then, in the center there, it was Jeremy Regan, both

3  who also have multiple communications with Bryant both in his

4  phone and on his Facebook regarding the sale of marijuana.

5  Q.  And the person in the top left, are they wearing a medical

6  mask?

7  A.  Yes.

8  Q.  Is that consistent with it being an image taken during the

9  time of the pandemic?

10 A.  Yes.

11 Q.  The image at the bottom that I am focusing in on, what type

12 of firearm was that?

13 A.  That was identified as a Drako, a Century Arms model Drako

14 micro.

15 Q.  Was that based on --

16 A.  I'm sorry.

17 Q.  Go ahead.  I'm sorry to cut you off.

18 A.  It's chambered in 762 by 39.

19 Q.  Did you have an expert look at this firearm to determine

20 whether or not it was a replica or whether or not it was real?

21 A.  Yes, I did.

22 Q.  Who did you have look at that image?

23 A.  I had Detective Steven Barbarini (phonetic) from the Palm

24 Beach County Sheriff's Office who is a retired ATF agent and he

25 determined that that firearm is a Century Arms model Drako; a

1  **Drako Micro is the correct term.**

2          MR. WALSH:  Judge, I would object to any findings.

3          I don't know if Mr. Barbarini is going to testify.  If

4  not, the Defense would object to any hearsay from his report

5  without being present to testify to it or having a report to

6  review.

7          THE COURT:  Mr. Funk?

8          MR. FUNK:  Your Honor, the hearsay is admissible

9  during the detention hearing.  And it is based on both the

10 opinion as to what kind of firearm is based on both the opinion

11 of Special Agent Christy as well as the expert Barbarini.

12         THE COURT:  Okay.  I will admit the testimony.

13         Go ahead, Mr. Funk.

14 BY MR. FUNK:

15 Q.  As a part of your investigation, did you see whether or not

16 there was a time that Mr. Bryant had traveled out-of-state and

17 was located in Louisiana?

18 A.  **Yes.**

19 Q.  What was of the date that he was in Louisiana?

20 A.  **So he was in Louisiana on July 20th and stopped by the**

21 **Jennings Police Department.**

22 Q.  July 20th of what year?

23 A.  **2020.**

24 Q.  So that would have been after his time of his arrest on

25 July 9th of 2020?

1  A.  **Correct.  Approximately eleven days following his arrest.**

2  Q.  Was he on bond at that time?

3  A.  **Yes, sir, he was.**

4  Q.  What happened in Louisiana with his encounter with law

5  enforcement?

6  A.  **He was stopped during a drug interdiction operation.**

7     **The Jennings Police Officer had conducted a traffic stop of**

8  **the vehicle which was traveling at a high rate of speed.**

9     **Upon stopping the car, Bryant was identified as the driver.**

10 **The other two subjects in the car were identified as Jeremy**

11 **Regan and Demetrius Smith, both who were identified in the**

12 **previous photograph in Colorado.**

13    **Probable cause was obtained to search the car and after**

14 **they searched the vehicle, they located a small amount of**

15 **marijuana and a small amount of cocaine.  Also, there was a**

16 **significant amount of cash located both on some of the**

17 **individual persons and within a bag within the vehicle.**

18    **The total was around $26,000.  I don't recall the exact**

19 **number.  There were also packaged materials located within the**

20 **vehicle consistent with drug trafficking, such as sandwich bags**

21 **and other items.**

22 Q.  Was anybody arrested for the drug trafficking in that

23 investigation down in Louisiana to your knowledge?

24 A.  **They were detained, questioned, and released pending the**

25 **outcome of the drug testing.  And also, there has been, I**

1  believe, a warrant issued for one of the subjects in that

2  vehicle for that offense.

3  Q.  Was that Mr. Bryant, though?

4  A.  No.

5  Q.  Did you, also, as part of your investigation locate on

6  YouTube an interview called Street Hustlers interview of

7  Mr. Bryant?

8  A.  Yes.

9  Q.  Do you know what date that came from?

10  A.  I don't recall the exact date, but it was after Mr.

11  Bryant's release from prison.

12  Q.  Does he identify himself as being a gang member in that

13  video?

14  A.  Yes.

15  Q.  What gang does he claim to be associated with?

16  A.  The 29th Street gang here in Fort Pierce.

17  Q.  Does he claim affiliation with any larger gang?

18  A.  Yes, the Bloods Street gang, both by his nationally

19  recognized hand signs.  Mr. Bryant also has a tattoo of 29 in

20  Roman numerals on his neck.

21  Q.  And the 29 would be related to the 29th Street gang?

22  A.  Correct.

23          MR. FUNK:  That's all the questions I have, Your

24  Honor.  Thank you.

25          THE COURT:  Okay.  It looks like Agent Christy may

 1   have frozen on us.

 2          Miss Griffin-Arnold, is he frozen on your screen?

 3          THE COURTROOM DEPUTY:  Yes, Your Honor.

 4          THE COURT:  Agent Christy, can you do me a favor and

 5   sign out and then sign back in and let's see if that helps us.

 6          THE WITNESS:  Yes, ma'am.

 7          THE COURT:  Thank you.

 8          THE WITNESS:  Can you still hear me okay?

 9          THE COURT:  I can hear you, yes.

10          THE WITNESS:  Okay.

11          THE COURT:  And we will just take a brief two-minute

12   break before Agent Christy to get back in and, then, Mr. Walsh

13   will have the opportunity to cross-examine.

14   (Thereupon, the proceedings resumed:)

15          THE WITNESS:  Can you hear me okay?

16          THE COURT:  Yes, we can, Agent.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  Mr. Walsh, you may proceed.

19          MR. WALSH:  Thank you.

20          THE COURT:  Oh, wait.  Hold on.  I don't see Mr. Funk.

21   There you go.  Hi, Mr. Funk.  You are muted.

22          MR. FUNK:  I'm back.  Thank you.

23          THE COURT:  Okay.  All right.  You may proceed,

24   Mr. Walsh.

25          MR. WALSH:  Thank you, Your Honor.

```
 1                        CROSS EXAMINATION
 2   BY MR. WALSH:
 3   Q.   Good morning, Agent Christy.
 4   A.   Good morning, sir.
 5   Q.   It is my understanding that the residential search warrant
 6   on 3706 Avenue K was executed July 9th of 2020; is that
 7   correct?
 8   A.   Yes, sir, it is.
 9   Q.   Were you involved in any investigation or surveillance of
10   Mr. Bryant prior to that date of the state search warrant?
11   A.   We began working on the case.  And when we initially
12   started doing our deconflictions running him in different
13   databases, he popped with an open case number from Osceola
14   County for an aggravated assault with a firearm.
15        Making contact with that Detective, yes, that's when I
16   became involved with the case and started actively
17   investigating.
18   Q.   Do you recall approximately how long prior to the date of
19   the search warrant July 9th that would have been roughly?
20   A.   Probably a week to ten days.  I don't recall exactly.  It
21   was the first week of July.
22   Q.   Understood.
23        And on the morning or the day of July 9th, had you been or
24   was law enforcement surveilling Mr. Bryant prior to him
25   arriving at the 3706 Avenue K location?
```

34

1  A.   **Yes.  Myself, along with members of the U.S. Marshals**
2  **Service and some Task Force Officers from Port St. Lucie Police**
3  **Department were assigned to ATF at the time, we were watching**
4  **the residence.**
5  Q.   Okay.  And it's my understanding, Mr. Bryant came to that
6  residence in what I believe is a blue Nissan Ultima that was
7  jointly occupied by a Mr. Shane Cole; is that correct?
8  A.   **Yes, sir.  That is correct.**
9  Q.   Mr. Bryant was the driver, correct?
10  A.   **Yes.**
11  Q.   Okay.  Are you aware or do you know if Mr. Bryant and
12  Mr. Cole made any stops anywhere before arriving at that
13  residence?
14  A.   **No.  We were doing stationery surveillance.  So we were**
15  **watching the house and the house alone.**
16  Q.   Understood.
17       And when the car pulled up to the residence at 3706 Avenue
18  K, at any point during your surveillance did Mr. Bryant enter
19  the home?
20  A.   **I could not see from my vantage point.  It is possible that**
21  **some of the other involved detectives and marshals saw that, or**
22  **saw something else.**
23  Q.   Okay.  Were you able to see if anyone exited the vehicle
24  from your vantage point?
25  A.   **The only person that I could see that left the vehicle was**

1  **Mr. Cole.**

2  Q.   Okay.  Could you see from your vantage point if Mr. Cole

3  went into the residence?

4  A.   **He appeared to go into the residence or at least up to the**

5  **back door.**

6  Q.   Okay.  Prior to his being detained and put in custody, did

7  you ever see Mr. Bryant leave the vehicle?

8  A.   **No, I didn't.  I did not see him leave the vehicle, no.**

9  Q.   Understood.

10      And at the time he was placed in custody, was Mr. Cole in

11  the vehicle with Mr. Bryant as well?

12  A.   **Prior to him being in custody?**

13  Q.   At the time he was handcuffed or when law enforcement made

14  their approach, were both subjects in the vehicle?

15  A.   **Yes.  Yes.**

16  Q.   Okay.  And to be clear and I think you clarified this for

17  the Judge earlier, the firearm in question in this case, the FN

18  was located inside a duffle bag, which was located inside the

19  closed trunk of the vehicle, correct?

20  A.   **The firearm was located in the trunk of the vehicle in a**

21  **bag.  I'm not sure if it was a duffle bag.  I believe it was**

22  **just a shopping bag perhaps, but it was located in the trunk of**

23  **the vehicle inside of a bag.**

24  Q.   Understood.

25      You mentioned on your direct examination that when you did

1  a search warrant of the residence that there was several

2  correspondence directed or addressed to Mr. Ronell Bryant at

3  that address, correct?

4  A.  **Can you repeat that one more time, sir?**

5  Q.  Yes, I'm sorry.

6     When you searched the home pursuant to the search warrant,

7  you indicated that there were several correspondence mailings

8  with Mr. Bryant's name to that address, the 3706 Avenue K

9  address; is that correct?

10  A.  **Yes, sir.  That's correct.**

11  Q.  Were there also mailings addressed to Mr. Bryant with a

12  different address?

13  A.  **I don't recall.  I would have to review some of the search**

14  **warrant photos.  We took photos of mostly all of the mail that**

15  **we had found in the room in question.  I don't recall if there**

16  **were any other addresses.**

17  Q.  Okay.  Did you review Mr. Bryant's driver's license when he

18  is placed under arrest to see what his listed or stated

19  residence is?

20  A.  **Yes.**

21  Q.  Do you recall what that was?

22  A.  **I don't recall his address.**

23     **I know it was not the address that we were at that day.  He**

24  **has a different address on his driver's license than on the**

25  **search warrant, where the search warrant was.**

1  Q.   In the time that you were doing stationary surveillance

2  attempting to locate Mr. Bryant prior to July 9th, do you know

3  if law enforcement was at that residence for any period of

4  time, whether a day or two days?

5  A.   **No.**

6  Q.   No, you don't know or, no, they weren't there?

7  A.   **I don't know if they were or not.  I don't know.**

8  Q.   Okay.  Do you know if there are any other addresses

9  associated with Mr. Bryant other than 3706 Avenue K?

10 A.   **From the time that I've been investigating this case, there**

11 **has been no other addresses that we can locate that are**

12 **affiliated with Mr. Bryant other than this one.**

13 Q.   Okay.  So the address on his driver's license is not

14 affiliated with Mr. Bryant?

15 A.   **It may have been at one time, but from our investigation**

16 **starting in July, it has not been.**

17 Q.   Okay.  If there were any mailers from the St. Lucie County,

18 Clerk of Court, or notices to appear that had an address other

19 than 3706 Avenue K, is that something you would document in

20 your report?

21 A.   **Yes.  Like I said, the only address that has been**

22 **associated with him from the time the investigation began was**

23 **this address.  That's how we knew where to find him when he**

24 **ultimately was arrested that day.**

25 Q.   Were you there when photographs of the execution of the

1  search warrant was being taken as far as documentation of what

2  they found and things of that nature?

3  A.   **Yes, sir.**

4  Q.   Okay.

5  A.   **Yes, sir, I was.**

6  Q.   There was some testimony earlier as to the gun box for an

7  FN firearm being located in one of the bedrooms; is that

8  correct?

9  A.   **Yes, sir.  That's correct.**

10  Q.   And I believe in reviewing the reports in discovery there

11  was paperwork found within that gun box to the registered

12  owner, Mr. Ernest Knight; is that correct?

13  A.   **Yes, sir.**

14  Q.   And it appears that there were also some fingerprint

15  analysis done on the paperwork within the gun case as well; is

16  that correct?

17  A.   **Yes, sir.  That's correct.**

18  Q.   And it's also correct that all of the confirmed -- any

19  confirmed latent prints that could be identified off that

20  paperwork all came back to Mr. Ernest Knight, correct?

21  A.   **I would have to review the report.**

22       **I don't think that -- because I didn't examine that report**

23  **or do a report on it myself.  I know that there were several**

24  **lifted fingerprints.**

25       **And that the way that they wrote the report was somewhat**

1  confusing.  So I can't answer that.  I know that the one

2  definitive print was found on the receipt, a Versace receipt

3  which was in the bag with the FN 57 pistol, which came back to

4  Ronell Bryant.

5  Q.  And maybe I will ask it a different way.

6      Are you aware of any DNA or fingerprint analysis from

7  either the firearm or the magazines connecting Mr. Bryant to

8  any of those firearms or ammunition?

9  A.  I'm not aware of any of Mr. Bryant's fingerprints being on

10  any of that information, no.

11  Q.  Okay.  Isn't it correct that Mr. Ernest Knight actually

12  appeared at the residence during the execution of the search

13  warrant on July 9th?

14  A.  Yes.

15  Q.  And I believe he spoke with a Detective Padon (phonetic)

16  that was at the scene as well; is that correct?

17  A.  I know that he spoke to Detective Jayden (phonetic).

18  Q.  Okay.  I'm sorry.  I may have had that wrong.

19  A.  Yes, Detective Jayden.

20  Q.  And Mr. Knight indicated that he sometimes resides at that

21  residence as well; isn't that correct?

22  A.  That's what he claimed, yes.

23  Q.  Okay.  And the firearm container, or the box and his

24  receipt was also found in the same room that is being described

25  as what you believe to be Ronell Bryant's room, correct?

1  A.  **That's correct.**

2  Q.  The bag in the rear of the trunk -- and the trunk was

3  closed at the time that Mr. Bryant was taken into custody,

4  correct?

5  A.  **I believe it was, yes.**

6  Q.  Okay.  You indicated that the bag contained male clothing;

7  is that correct?

8  A.  **Correct.**

9  Q.  As well as a firearm?

10 A.  **Correct.**

11 Q.  Do you have any of idea whether some of that clothing

12 belonged to Shane Cole as opposed to Ronell Bryant?

13 A.  **Well, the receipt found within the bag, which I believe one**

14 **of the latent prints was lifted from came back to Ronell Bryant**

15 **and it had Ronell Bryant's name on the receipt, as well as a**

16 **credit card number.**

17     **So I'm not sure.  My experience has been that shows**

18 **ownership of that bag.  I didn't see any receipts with Shane**

19 **Cole's name on it.**

20 Q.  Did you review the date that that receipt was issued?

21 A.  **I didn't on the day.  I have not reviewed it recently.  I'm**

22 **not sure what date it was.**

23 Q.  Okay.  Would you agree that it's possible Shane Cole's

24 belongings could have been in that bag along with some of

25 Ronell Bryant's belongings?

1        MR. FUNK:  Objection; calls for speculation.

2        THE COURT:  Sustained.

3        MR. WALSH:  I'm sorry.  I didn't hear the Court's

4    ruling.  I apologize.

5        THE COURT:  Sustained.

6        MR. WALSH:  Okay.

7        THE COURT:  I believe it calls for speculation.

8        MR. WALSH:  Thank you.

9    BY MR. WALSH:

10   Q.   You indicated on direct testimony that the images that were

11   admitted in evidence you had dates when they were uploaded to

12   either Instagram or I believe you said -- I believe actually

13   all of the still photos were from his open Instagram account,

14   Mr. Bryant's open Instagram account; is that correct?

15   A.   **There were some from the Instagram that had dates on them**

16   **showing the date that it was posted.  Not the date that it was**

17   **actually created.**

18       **There was also corresponding photographs where I knew it**

19   **was from his phone extraction that matched the photos from his**

20   **Instagram and Facebook.**

21       **So you could tell that, you know, the phone, he had**

22   **uploaded those photos to the social media from his phone or at**

23   **least taken the pictures from his phone.**

24   Q.   Understood.

25       My question would be -- and I understand what you're saying

1  is that they were uploaded to the social media directly from

2  his phone.

3      My question would be is there anything that you have that

4  would tell us exactly when the photo was taken, created, not

5  uploaded?

6  A.  **There is some metadata that we were able to get from the**

7  **search warrants.**

8      **I have not had that looked at by an expert and I am not an**

9  **expert myself when it comes to that particular forensic**

10 **evidence when it comes to phones.**

11 Q.  Understood.

12     And there was some testimony regarding alleged drug

13 trafficking activities by Mr. Bryant.  To your knowledge, has

14 he been arrested for any of that alleged activity as of today?

15 A.  **No.**

16 Q.  There was also testimony and a photograph of Mr. Bryant

17 next to what is alleged to be marijuana taken in Colorado.

18     Do you know any of the circumstances around that

19 photograph?

20 A.  **No, I don't.  Other than it was located within a string of**

21 **photographs taken in Colorado or what I presume was Colorado.**

22 Q.  Do you have any information as to whether or not that might

23 have been taken at a legal dispensary or a marijuana

24 establishment that is in Colorado?

25 A.  **No.**

1  Q.   The Louisiana altercation with law enforcement, to your

2  knowledge has a warrant or is there any outstanding criminal

3  charge pending for Mr. Bryant as a result of that traffic stop?

4  A.   **No criminal charges have been filed as far as I am aware**

5  **of, but the money was seized during that traffic stop.**

6  Q.   And do you know if that money specifically belonged to

7  Mr. Bryant as opposed to the other two occupants?

8  A.   **Yes.  So Mr. Bryant has said repeatedly, both on social**

9  **media and also by interactions that that money did, in fact,**

10 **belong to him.**

11 Q.   Okay.  And I think we went over this on direct, but it is

12 your understanding Mr. Bryant is a performer, a rapper?

13 A.   **Yes.**

14 Q.   Do you have any information of how he gets paid for his

15 shows or his performances?

16 A.   **Other than from what he has told me, we don't have any**

17 **direct information.  He says he gets paid a substantial amount**

18 **of money from his performances and he also received a cash**

19 **advance from his record deal.**

20 Q.   And is it fair to say going back to the actual execution of

21 the search warrant on the Altima that at the time they were

22 arrested neither Mr. Bryant or Mr. Shane Cole had actual

23 physical possession of that firearm?

24 A.   **Other than the photographs, no.**

25      **There is also other agents and officers who were involved**

1  **in this case that had brought the information to me, which is**

2  **why we began the investigation in the first place.**

3      **So that would probably be better answered by one of them,**

4  **but there is information, other information.  I'm not the best**

5  **person to ask.**

6  Q.   Maybe I will rephrase the question.

7      My question would be, at the time Mr. Bryant was placed

8  under arrest and Mr. Cole was in the passenger seat, did either

9  one of them have direct access to or dominion and control over

10  that firearm?

11  A.   **No.**

12          MR. FUNK:  Objection; compound and vague.

13          THE COURT:  Overruled.  You may answer.

14  A.   **Mr. Bryant was in the front seat and Mr. Cole was in the**

15  **front seat as well.  So the firearm being found in the trunk,**

16  **they did not have immediate control over that firearm at the**

17  **time.**

18          MR. WALSH:  I have no further questions, Your Honor.

19          THE COURT:  Any redirect, Mr. Funk?

20          MR. FUNK:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. FUNK:

23  Q.   Agent Christy, when Mr. Cole and Mr. Bryant were detained

24  in the vehicle was Ernest Knight on scene at that point in

25  time?

1  A.  **No, he was not.**

2  Q.  With regards to the images of Colorado, both the images of

3  the snow where they had the guns and the firearm, as well as

4  the box of marijuana that Mr. Bryant is next to, what were the

5  sorts of conversations that were being had on social media

6  around the time that those two photographs were uploaded or

7  created?

8  A.  **So there were a substantial amount of messages on his**

9  **Facebook obtained through a Facebook search warrant where he is**

10 **communicating with other individuals who are soliciting him for**

11 **marijuana right up until maybe a week or so before his arrest.**

12 **And continuing back almost until the time period where we**

13 **believe that he went to Colorado.**

14         MR. FUNK:  Your Honor, that's all the questions I

15 have.  Thank you.

16         THE COURT:  Okay.  Agent, I just have one question.

17         You testified that July 20th of 2020 he was stopped by

18 law enforcement in Louisiana.  And I heard you say that they

19 found a small amount of marijuana in the car and then you said

20 26,000, but 26,000 what?

21         THE WITNESS:  Dollars.

22         THE COURT:  $26,000 in the car.

23         THE WITNESS:  Yes, ma'am.

24         THE COURT:  Okay.  And anything else found in the car?

25         THE WITNESS:  There were small amounts of cocaine and

1   small amounts of marijuana.  There was also packaging material,

2   such as sandwich bags and some other materials that are

3   consistent with trafficking in narcotics.

4         THE COURT:  Okay.  And then, so when you said that was

5   shortly after he was released on bond, that is released on bond

6   for the state charge of possession of a firearm; is that right?

7         THE WITNESS:  Yes, ma'am.  That's correct.

8         THE COURT:  Okay.  Now do you have any knowledge of,

9   there's also on the Pretrial Services Report, it looks like

10  charges from May of 2020 for aggravated assault with a deadly

11  weapon, possession of a firearm, unlawful discharge of a

12  firearm and battery.

13        Do you have any knowledge of those charges or any

14  information about those charges?

15        THE WITNESS:  Those charges originated from Osceola

16  County.

17        THE COURT:  Okay.

18        THE WITNESS:  And that is part of the investigation.

19        When we arrested Mr. Bryant on July 9th, we were

20  actually arresting him on those charges out of Osceola County

21  with the Marshals Service.  The firearm was discovered as a

22  result of the investigation that we did on scene.

23        THE COURT:  Okay.  So that's why you were there.

24        THE WITNESS:  Correct.

25        THE COURT:  Okay.  All right.  And is that case still

47

1  pending to your knowledge?

2          THE WITNESS:  To my knowledge it has been nolle

3  prossed or abandoned.

4          THE COURT:  Okay.  All right.  Any questions on any of

5  that, Mr. Walsh?

6          MR. WALSH:  I would just to clarify, Agent Christy,

7  there was nothing tying the firearm that he is charged with in

8  this case to that Osceola case as far as you are aware of,

9  correct?

10          THE WITNESS:  No.  Nothing as far as I am aware of,

11  no.

12          MR. WALSH:  No further questions.  Thank you, Your

13  Honor.

14          THE COURT:  All right.  Thank you.

15          Thank you, Agent.

16          THE WITNESS:  Thank you, ma'am.

17          THE COURT:  Okay.  Any other evidence, Mr. Funk?

18          MR. FUNK:  No, Your Honor.  Thank you.

19          THE COURT:  Okay.  Any evidence, Mr. Walsh?

20          MR. WALSH:  Yes, Judge.

21          I do have Miss Luciana Knight.  It's Mr. Bryant's

22  mother.  I believe she's present and she was -- I'm not sure if

23  she is still on.

24          THE COURT:  All right.  Miss Knight, are you still on,

25  ma'am?

```
 1              WITNESS KNIGHT:  Yes, ma'am.
 2              THE COURT:  Miss Knight, are you in a position to turn
 3    on -- do you have a camera on your phone?
 4              WITNESS KNIGHT:  Yes, ma'am.
 5              MR. WALSH:  Miss Knight, can you hear us?
 6              WITNESS KNIGHT:  Okay.  I'm going to exit.
 7              THE COURT:  Okay.  All right.  Let's just take a
 8    couple of minutes break here so Miss Knight can get situated.
 9              Thank you for your patience, ma'am.  I know it has
10    been a long morning.
11              WITNESS KNIGHT:  I'm ready.  I was just wanting to get
12    outside of the vehicle.
13              THE COURT:  Okay.  Are you able to turn on a video
14    camera so I can see you?
15              WITNESS KNIGHT:  Let's see here.
16              MR. WALSH:  It should be at the bottom left-hand
17    corner.
18              WITNESS KNIGHT:  Bottom left-hand corner.
19              MR. WALSH:  Start video.
20              WITNESS KNIGHT:  Start video.  Oh, what happened?
21              Hold on.  I have to go into it.
22              THE COURT:  Sure.
23              THE COURTROOM DEPUTY:  Your Honor, this is Colette.
24              Perhaps it would be easiest if Miss Knight was to log
25    out of Zoom and just log back in.
```

```
 1            THE COURT:  Yes.  Sometimes when people have been on
 2   for a while it becomes difficult for them to turn on their
 3   camera.
 4            WITNESS KNIGHT:  Yeah, I think that's what happened.
 5            THE COURT:  All right.  Go ahead, Miss Knight, and log
 6   off and then come back into the Zoom room and that should --
 7   maybe that will reset it for you.
 8            WITNESS KNIGHT:  Okay.
 9            THE COURT:  And we'll wait for you, ma'am.
10   (Thereupon, the proceedings resumed:)
11            WITNESS KNIGHT:  Can you see me now?
12            THE COURTROOM DEPUTY:  Yes, I can.  Just one moment,
13   please.
14            THE COURT:  Okay.  Mr. Walsh, you were going to
15   present evidence through Mr. Bryant's mom.
16            MR. WALSH:  It's his mother.  I don't know if the
17   Court wants to swear her in first.
18            THE COURT:  Yes, ma'am.
19            If you could raise your right hand so you could be
20   sworn in by the Courtroom Deputy.
21            THE WITNESS:  Yes, ma'am.  (Complied.)
22   (Witness sworn.)
23            THE COURTROOM DEPUTY:  Please state your name.
24            THE WITNESS:  Luciana Knight.
25            THE COURTROOM DEPUTY:  And spell your first and last
```

1  name.

2          THE WITNESS:  Luciana, L-U-C-I-A-N-A; Knight,

3  K-N-I-G-H-T.

4          THE COURTROOM DEPUTY:  Thank you.

5          THE COURT:  Counsel, you may inquire.

6          MR. FUNK:  Thank you, Your Honor.

7              LUCIANA KNIGHT, DEFENSE WITNESS SWORN

8                      DIRECT EXAMINATION

9  BY MR. WALSH:

10  Q.  Miss Knight, can you tell the Court how you know Ronell

11  Bryant?

12  A.  **That is my son; firstborn son.**

13  Q.  And do you have any other children other than Ronell?

14  A.  **Yes, sir.  Zionte (phonetic); 21.**

15  Q.  And that's your other son?

16  A.  **Yes, sir.**

17  Q.  Okay.  And where do you live, ma'am?

18  A.  **3706 Avenue K, for the Fort Pierce, Florida 34947.**

19  Q.  And how long have you lived there?

20  A.  **20 something years.**

21  Q.  Okay.  Was Ronell born and raised in that home?

22  A.  **Yes, sir.**

23  Q.  Okay.  Has he lived Fort Pierce most his life?

24  A.  **Yes, sir.**

25  Q.  Is the majority of his extended family from that area or in

1  that area?

2  A.  **Yes, sir.**

3  Q.  Okay.  Obviously you are familiar with the events of

4  July 9th when law enforcement executed a search warrant on your

5  home?

6  A.  **Yes, sir.**

7  Q.  You gave police permission to enter your home that day,

8  correct?

9  A.  **Yes, sir.**

10  Q.  I'm sorry?

11  A.  **Well, actually, when I got there they told me I couldn't go**

12  **inside of my home because the house was being -- whatever they**

13  **said for a search warrant.  So I was saying what's my house got**

14  **to do with it, you know.**

15  Q.  Right.

16  A.  **And I said, well, I have to see if my godson is in my house**

17  **because I left him there -- well, I actually to meet me there.**

18  **I left the back door open for him to come in.**

19  Q.  Understood.

20     After speaking with law enforcement and being brought up to

21  speed, you agreed to give them consent to search the home,

22  correct?

23  A.  **They was already in.  So let them search.**

24  Q.  Okay.  And at that time, during that time in July of 2020,

25  was Ronell living at that home with you?

1  A.  **No, sir.**

2  Q.  Okay.  Who was living at that home on a nightly basis, on

3  an every night basis?

4  A.  **Yes.  Asiana (phonetic).**

5  **My cousin Ernest Knight lives there.  Him and his**

6  **girlfriend was going through things so I let them stay there**

7  **for a while.**

8  **Previous to that my brother Octavia Tash (phonetic) was**

9  **living there until he got his place in Port St. Lucie.**

10 Q.  Was Ronell, for lack of a better word, on the road a lot

11 during that time?

12 A.  **Yes, sir.**

13 Q.  Is that part of his profession where he travels --

14 A.  **Yes.**

15 Q.  -- for work?

16 A.  **Yes, sir.**

17 Q.  Would he stay on that residence on a weekly or nightly

18 basis with you at 3706 Avenue K?

19 A.  **No, sir.**

20 Q.  Okay.  There was some firearm and ammunition found in the

21 bedroom as far as banana clips located in a Crown Royal bag.

22 Are you familiar with that ammunition?

23 A.  **Yes, sir, I am.**

24 **I explained to the officer everything that I owned.  I told**

25 **him I had two fully loaded clips back there.  I told him they**

1  was in the -- back there in the room with my gun safe.  My gun

2  safe is also in that second back room on the floor on your

3  right-hand side.

4  Q.  But, specifically, those banana clips with the ammunition,

5  did that belong to you?

6  A.  **Yes, sir.**

7  Q.  Okay.  And there was another firearm, I believe, located on

8  your bed; a .9 millimeter.

9       Did that belong to you as well?

10 A.  **Yes, sir.**

11 Q.  And just so the Court is aware, are you a licensed

12 firearm --

13 A.  **Yes, I am.**

14 Q.  -- carrier?

15      You have CCW?

16 A.  **Yes, I am, sir.**

17 Q.  Okay.

18 A.  **I had two.  I keep one personally on me.**

19      **That's the one I told him I left under my pillow and then I**

20 **put one right inside of my closet on the floor.**

21 Q.  There was some testimony also about a box with for an FN

22 firearm that was registered to an Ernest Knight.

23      Is that the same Ernest Knight that you mentioned

24 occasionally --

25 A.  **Yes.**

1  Q.    -- stayed with you at that home?

2  A.    **Yes, sir.**

3  Q.    Okay.  Would he stay there sporadically, or was it here and

4  there, or how often would he stay there?

5  A.    **I mean, him and his baby mama, they always going through**

6  **something.  Instead of him getting in trouble, I would always**

7  **tell him he could come there.  So he had been there.**

8      **And then, you know, he would leave because he doesn't**

9  **really -- he works in -- out of town.  So, like, he's working**

10 **most of the day and most of the night and then he comes back.**

11 Q.    Does Ronell still receive some mail or junk mail at that

12 residence?

13 A.    **Every blue moon he may get some junk mail.**

14 Q.    Okay.  On the day, July 9th, that this all happened, do you

15 recall if Ronell and Mr. Shane Cole spoke with you or met with

16 you prior to going to the home?

17 A.    **Yes, sir.**

18 Q.    Do you know why they did that?

19 A.    **Yes, sir.**

20     **I was driving the manager's car that day and they was**

21 **getting ready to come back down.  And they asked me where I was**

22 **because they changed his car and he needed to be dropped off**

23 **because Ronell was waiting to go home.**

24     **They came to the store.  Shane Cole came to the store where**

25 **I was.  He met me.  He got my house keys and they went and**

1  **proceeded to the house.**

2  Q.   Did they need your house keys to get into the home?

3  A.   **Yes, sir.**

4  Q.   So Ronell does not have a set of his own keys to that home?

5  A.   **No, sir.**

6  Q.   Okay.  Is it after that point when you learned the police

7  had arrested Ronell and were at the home?

8  A.   **Yes, sir.**

9       **My neighbor started calling me and they told me that the**

10  **police had my house surrounded and they was picking up my son.**

11      **So I was, like, for what?  I left everything and went**

12  **running to see what was going on.**

13      **When I pulled up I heard somebody say there go the mom,**

14  **there go the mom.  And I seen an officer coming out of my back**

15  **door, like, closing the door.**

16  Q.   And the officers indicated when they searched the home that

17  there were multiple male clothing items in the same bedroom as

18  the FN box.

19      Do you know whose clothes those are?

20  A.   **Yes, sir.**

21  Q.   Whose are they?

22  A.   **I could -- can you repeat yourself.  I couldn't hear you.**

23  Q.   If you know, whose clothes are they, please?

24  A.   **Oh, yes, sir.  My son's Zionte Bryant.**

25  Q.   And does he live there currently?

1  A.  **Not at this moment, but his clothes are there.**

2  Q.  Where is your other son?

3  A.  **He's currently incarcerated.**

4  Q.  Okay.  Are you keeping his belongings there until he gets

5  released?

6  A.  **Yes, sir.**

7  Q.  Okay.

8       MR. WALSH:  Okay.  I don't have any further questions,

9  Your Honor?

10      THE COURT:  Any questions, Mr. Funk?

11                     CROSS EXAMINATION

12 BY MR. FUNK:

13 Q.  Miss Knight, prior to July 9th of 2020, when was the last

14 time that Mr. Bryant had lived at the residence or had been at

15 the residence, for that matter?

16 A.  **Well, the last time he had been there was maybe four or**

17 **five days he stopped by and told me that he was getting ready**

18 **to go down south.**

19 Q.  That's before he went down to do a music video in Fort

20 Lauderdale?

21 A.  **Yes.**

22 Q.  And you said that you are familiar with the room because

23 you recognize some of the clothing that was in the room; is

24 that correct?

25 A.  **Yes, sir.**

1 Q.   What is your son's profession?

2 A.   **My son is a rapper.**

3 Q.   Okay.  Within the room --

4 A.   **An entertainer.**

5 Q.   Within the room there is also recording equipment, right?

6 A.   **Yes, sir.**

7 Q.   There was on July 9th?

8 A.   **Yes, sir.  That's old equipment he had.**

9 Q.   Okay.  And would it be consistent with his room if there

10 was medication that was found in there, pill bottles for your

11 son, Ronell?

12 A.   **Well, right now, sir, I was in the process of -- my house**

13 **is cluttered because I was buying a lot of things because I'm**

14 **getting ready to get a bigger house.  So I have all sorts of**

15 **stuff around the house.**

16 Q.   Okay.  Would it be consistent with being his room if there

17 was rap lyrics that was also found in the room?

18 A.   **No, sir.  Because everything was pushed out of the first**

19 **room and everything was pushed into that room.  That's like a**

20 **spare room.**

21 Q.   Which room do you mean the spare room?

22 A.   **The second; the second room.**

23 Q.   Let's talk about the layout of your house.  Starting first

24 if we were both standing --

25              THE COURT:  Mr. Funk?

1      MR. WALSH:  Yes.

2      THE COURT:  I think you're going too far afield into

3   the specifics of her house and that sort of thing.

4      I only need to consider the strength of the

5   Government's case, but for purposes of this hearing, I am

6   primarily interested -- well, solely interested in danger to

7   the community and risk of flight.

8      So I don't think we need to talk about the layout of

9   her house right now.

10     MR. FUNK:  I would like to touch on an issue of

11  credibility with the witness and it does involve her

12  identification of where Mr. Bryant stayed in the house.

13     I believe that she identified for the law enforcement

14  officers that there was a bedroom, the first bedroom to the

15  left that she identified as being his.

16     THE WITNESS:  No, that's --

17     THE COURT:  Wait, wait, wait, wait.  Miss Knight, we

18  don't talk over each other in court.

19     THE WITNESS:  Oh.

20     THE COURT:  I'm going to hear from Mr. Funk and then

21  I'm going to decide as to whether I am going to let him go into

22  this questioning.

23     Go ahead, Mr. Funk, briefly.

24     MR. FUNK:  I believe that she identified a bedroom for

25  law enforcement, which is inconsistent with where Mr. Bryant

1    would have resided in the house.

2         THE COURT:  Well, she said Mr. Bryant didn't live

3    there.

4         MR. FUNK:  He would have kept his belongings or spent

5    time when he stayed.

6         THE COURT:  No, I'm not going to let you go into that

7    right now.

8         MR. FUNK:  Okay.  If I could have one moment, Your

9    Honor?

10        THE COURT:  You may.

11        MR. FUNK:  That's all the questions I have, Judge.

12   Thank you.

13        THE COURT:  Okay.  Anything else with this witness,

14   Mr. Walsh?

15        MR. WALSH:  No, Your Honor.  Thank you.

16        Miss Knight, if you could please log off.

17        THE WITNESS:  Okay.  Thank you so much.

18        THE COURT:  Well, Miss Knight --

19        MR. WALSH:  Oh, I'm sorry.

20        THE COURT:  You don't have to log off.

21        If you want to hear the remainder of the hearing, you

22   can just turn off your camera and listen in --

23        THE WITNESS:  Okay.

24        THE COURT:  -- or you could log off if you would like

25   to.

```
 1              THE WITNESS:  Okay.  Thank you.
 2              THE COURT:  All right.
 3              MR. WALSH:  I apologize, Your Honor.
 4              THE COURT:  Any other evidence, Mr. Walsh?
 5              MR. WALSH:  No, Your Honor.  Just argument.
 6              THE COURT:  All right.  Argument, Mr. Funk and then I
 7    will hear argument from Mr. Walsh.
 8              THE COURT:  If you want to hear the remainder of your
 9    hearing, you could just turn your camera off.
10              MR. FUNK:  I apologize, Your Honor.
11              THE COURT:  Any other evidence Mr. Walsh?
12              MR. WALSH:  No, just argument.
13              MR. FUNK:  Argument, Mr. Funk and then I will hear
14    argument from Mr. Walsh.
15              THE COURT:  You're on mute, Mr. Mr. Funk.
16              MR. FUNK:  The concern regarding danger to the
17    community involves Mr. Bryant's repeated possession of
18    firearms.
19              When you look at the Pretrial Services Report,
20    obviously there is that 2013 event where he was acquitted.  I
21    am not asking the Court to take that into consideration in and
22    of itself, but it would have certainly put Mr. Bryant on notice
23    that possession of a firearm could cause him significant legal
24    troubles.
25              In 2016, he then picks up a carry and conceals
```

1   firearms charge.  What I think is important to note in that is

2   that the multiple violation of probation that come from a D

3   U.S. and a disorderly conduct.  But coupled with that, with the

4   driving while suspended license that comes in 2018, there was a

5   firearm that was found in the car.  I know he didn't get

6   charged for the firearm in the car, but still it's a concern

7   that he was around a firearm while he was on probation.

8          He has multiple violations while he's on probation.

9   There's a concern that he would not be able to follow the

10  orders of the Court based on that prior behavior.

11         The 2020-case was nolle filed --

12         THE COURT:  Mr. Funk, could I just ask a question

13  about that?

14         MR. FUNK:  Yes, Judge.

15         THE COURT:  So he was convicted of carrying a

16  concealed weapon February 14th of 2019; is that correct?

17         MR. FUNK:  I believe so.  In fact, if I could have one

18  moment, Your Honor.

19         THE COURT:  Sure.

20         And really my question is I want to know where is that

21  on the Pretrial Services Report?

22         MR. FUNK:  The 2019 conviction, on the left-hand side

23  is August 24th of 2016.

24         THE COURT:  Okay.

25         MR. FUNK:  The indication he is shown on bottom right

1   corner on the far right block.

2   　　　　　THE COURT:  Okay.  And so that was not until

3   February 14th of 2019 because he had, I guess, another

4   violation of probation and at that point he was adjudicated

5   guilty.

6   　　　　　MR. FUNK:  That's correct.

7   　　　　　He originally pled no contest in May 11, 2017, and he

8   had adjudication withheld.  Then, he had what appears to be

9   three subsequent arrests for violation of probation.

10   　　　　　THE COURT:  Okay.  So as of May 11th of 2017, he has

11   pled no contest of carrying a concealed firearm.  He has not

12   been adjudicated, but he is on 24 months of probation.

13   　　　　　And then he has the violation of probation arrest and

14   it's not until February 14th of 2019 that he is officially

15   adjudicated guilty, but he has been on probation for that and

16   pled no contest to it two years before which would have been

17   May 11th of 2017, correct?

18   　　　　　MR. FUNK:  Correct.

19   　　　　　THE COURT:  Okay.  All right.  So when he is stopped

20   on February 2nd of 2018, driving with a license suspended and

21   they find a gun inside his vehicle, that is about eight months

22   after he has pled no contest to carrying a concealed firearm,

23   correct?

24   　　　　　MR. FUNK:  Correct, Your Honor.

25   　　　　　THE COURT:  Okay.  And then, he is adjudicated guilty

1  February 14th of 2019.

2          So after that we get to the pandemic in 2020 and you

3  showed me the Flow video stills where he has on the masks.  And

4  in Exhibit 14, he has a gun in his waistband and in Exhibit 15,

5  he has a gun at his crouch, correct?

6          MR. FUNK:  Yes, ma'am.

7          THE COURT:  Okay.  So that is after the conviction

8  after the pandemic.

9          And then, you showed me Exhibit 17, which is in

10  Colorado and he is holding a large firearm, correct?

11          MR. FUNK:  Correct.

12          THE COURT:  And we know that is after the pandemic

13  because one of his friends in the video had on a mask, correct?

14          MR. FUNK:  Correct.  That as well as the conversation

15  about travel to Colorado occurred in social media as well.

16          THE COURT:  Okay.  And then, was there any other

17  evidence of him having a gun after either in what the Agent

18  testified to or in the Pretrial Services Report after his

19  conviction of February 14th of 2019?

20          MR. FUNK:  No, not the certain evidence at this

21  detention hearing at this point in time.

22          THE COURT:  Okay.  But he does get while he got

23  arrested, even though it was dropped, for aggravated assault

24  with a deadly weapon in Osceola County and that was last year

25  as well, right, in May of 2020?

1    MR. FUNK:  Yes, ma'am.

2    THE COURT:  And then, when you do the search warrant

3  at his mother's house, even though the box with somebody else's

4  name is found in the bedroom, in the car there is a bag with a

5  gun, correct?

6    MR. FUNK:  Correct.

7    THE COURT:  Okay.  All right.  Go ahead.

8    MR. FUNK:  So, Your Honor, on that timeline there is a

9  concern for the safety of the community that he is an

10  associated gang member.

11    He has been drug dealing in what appears to be large

12  quantities of drugs.  He has large amounts of U.S. currency,

13  which is consistent with drug dealing.  You can see in the

14  Colorado video, when he is a convicted felon, he is in

15  possession of the Drako firearm.

16    So he has failed to abide by the rules as you can see

17  from the violations of probation in the past.  And there is a

18  concern that he would not discontinue his gang affiliation and

19  not abide by the orders of the court with regards to the

20  possession of firearms and may participate in drug dealing for

21  the purpose of making an income.

22    So for all those reasons, Judge, I don't believe there

23  is any condition or combination of conditions that would assure

24  that he is not going to violate the conditions of his release

25  or secure the safety of the community.

1          THE COURT:  Thank you, Mr. Funk.

2          Mr. Walsh, I will hear you, sir.

3          MR. WALSH:  Yes, Judge, briefly.

4          Just to recap, this case revolves around the search

5    warrant obviously being executed on July 9th of 2020.  My

6    client was a driver in a car with another passenger.  The

7    firearm that was located was in the trunk of the vehicle inside

8    a bag.  The Agent was pretty clear that neither one of them

9    were in any kind of dominion or control over that firearm.

10         THE COURT:  But didn't the Agent also say there was a

11   Versace receipt in the bag with your client's fingerprints on

12   it?  Did I hear that?

13         MR. WALSH:  There was a receipt with my client's name

14   on it as well --

15         THE COURT:  Okay.  With his name?

16         MR. WALSH:  With his name.

17         And I believe that is where I am confused, but there's

18   multiple receipts.  The receipt that was in the bag was not a

19   Versace receipt, but there was a Versace receipt with my

20   client's fingerprint on it as well.  The receipt --

21         THE COURT:  Okay.  So we don't know from the evidence

22   on the record we --

23         MR. WALSH:  Correct.

24         THE COURT:  -- don't know if that was in the bag?

25         MR. WALSH:  Correct.

1          THE COURT:  But there was a receipt with his name on

2     it in the bag with the gun?

3          MR. WALSH:  Correct.  That was testified to.

4          THE COURT:  Okay.  Go ahead.

5          MR. WALSH:  As Your Honor recapped, my client is a

6     convicted felon, but only as of February 14th of 2019.

7          It is the Defense's position that although there may

8     be circumstantial evidence that some of those photographs might

9     have been taken subsequent to his conviction, the Government

10    has not met the burden of proving that at the time those

11    photographs were taken, one, that he was a convicted felon and,

12    two, that those are actual legitimate firearms as opposed to

13    prop weapons that are used in rap videos.

14         Mr. Bryant has lived in Fort Pierce his entire life.

15    He has one prior felony conviction.  I don't know the exact

16    number.  I believe it's three or four misdemeanor convictions

17    for disorderly conduct and driving under a suspended license.

18         He has no violent felony convictions on his record.  I

19    believe the only violent charge was a misdemeanor battery when

20    he was a juvenile.  He was on bond.

21         I think it is important for the Court to understand

22    that as of July 9th, the date of his arrest, he was on bond in

23    the state matter up until his arrest of roughly a week ago in

24    this case.  I know there was some testimony and the Government

25    has suggested that he is involved in large scale drug dealing

1   and that's the explanation for his currency.

2          It is also important to notice that he is a very

3   popular and well-known performer and rap artist who does get

4   paid in cash for performances.

5          There has been no evidence, no arrests, no even

6   outstanding warrant for any alleged drug dealing that the

7   Government is relying on that has posed a danger to the

8   community.

9          THE COURT:  Well, I mean, they don't have an arrest or

10  a warrant, but they do have that picture of him next to all

11  that weed.

12         MR. WALSH:  That's correct.

13         Taken in Colorado with no other context other than it

14  is believed to be marijuana.

15         Judge, I would just suggest that based on the totality

16  of the circumstances, the strength of the case, and all the

17  surrounding circumstances that there is a form of release,

18  whether it be electronic monitoring, or a personal surety bond,

19  or whatever the Court would feel is appropriate, short of

20  detention that would both assure his presence at court and also

21  protect against any perceived danger to the community.

22         THE COURT:  Thank you, Mr. Walsh.

23         Okay.  So I want to be clear for Mr. Bryant that my

24  job at this hearing today is not to determine whether you are

25  guilty or innocent of being a convicted felon in possession of

1  a firearm.

2          That is the Government's charge.  They have put a lot

3  of evidence out.  I have heard a lot of evidence about whether

4  you were living at the house and who was living in what room.

5  That is not the issue before me.

6          My only job today is to determine whether you are a

7  risk of flight or a risk of danger.  Now in determining whether

8  you are a risk of danger, the Government is entitled to tell me

9  the strength of their evidence on the current charge against

10 you.  But it is not my role to decide whether you are guilty or

11 innocent of that charge.  I want to make that clear.

12         I am going to detain you.  I am not going to give you

13 a bond and I want to make sure you to understand why.

14         The first issue I want to say I do not believe you are

15 a risk of flight.  You have strong ties in Fort Pierce.  Your

16 mom testified.  She's a working woman.  She has been there

17 living on Avenue K, I think she said, living there for more

18 than 20 years.

19         You have been on bond before.  There is no evidence of

20 you failing to appear in court.  There is no evidence of you

21 trying to flee from law enforcement.  You do have the

22 violations of probation.  But other than that, there is no

23 evidence before this Court that you are a risk of flight.  So I

24 find that you are not.  The Government has not established

25 that.

1          However, I do find that you are a danger to the

2    community based on what they have established for my purposes,

3    which is that after you pled no contest on May 11th of 2017 to

4    carrying a concealed firearm and you were placed on 24 months

5    probation, they have established, for my purposes, a number of

6    incidences of you having guns even after that.

7          And for me that is a danger to the community because

8    what that says is no matter what I say to you, or no matter

9    what conditions of bond I put you on, you are going to still

10   carry guns if you want to.  You are still be around people who

11   have guns if you want to.  You are still going to do videos and

12   pictures holding guns if you want to.

13         And so my job is to make sure that the community is

14   safe from that.  And for those reasons I cannot give you a

15   bond.  I will issue a written report, which will set out my

16   reasons more specifically, but that is the substance of my

17   ruling.

18         All right.  Is there anything else, Mr. Walsh, that I

19   need to do today?

20         MR. WALSH:  I don't believe so.  No, Your Honor.

21         THE COURT:  Anything else, Mr. Funk?

22         MR. FUNK:  No, Your Honor.  Thank you.

23         THE COURT:  Okay.  Well, let me see.  Miss

24   Griffin-Arnold, have I entered the appropriate orders?  Do we

25   have an upcoming hearing in this case?  Where are we with this?

1          THE COURTROOM DEPUTY:  Judge, maybe the Due Process

2    Protections Act should be entered and our upcoming hearing is a

3    preliminary hearing/arraignment set for April 12th.  That's

4    next Monday at 10:00 a.m.

5          THE COURT:  Okay.  Is this case going to go before the

6    Grand Jury before then, Mr. Funk?

7          MR. FUNK:  I don't believe so, Judge, no.

8          THE COURT:  Okay.  Mr. Walsh, do you have any

9    objection to this hearing serving as a probable cause hearing

10   as well?  We have gone over and over all the evidence in this

11   case.

12         MR. WALSH:  The Defense has no objection, Your Honor.

13         THE COURT:  So what we will do is I will find that

14   there is probable cause for these charges.

15         Again, Mr. Bryant, it doesn't mean that you are guilty

16   or innocent.  It is just about whether there is enough evidence

17   to continue with this charge.  I will find probable cause.

18         And Mr. Funk, if you could estimate for me when you

19   expect to have presented something to the Grand Jury?

20         MR. FUNK:  I believe that it will be the last week of

21   April.

22         THE COURT:  Okay.  Miss Griffin-Arnold, can you give

23   me a date?  Maybe the last Friday in April.

24         THE COURTROOM DEPUTY:  That would be Friday,

25   April 30th.

1        THE COURT:  Okay.  So we'll set -- how does that look

2   for your calendar, Mr. Walsh, 10:00 a.m., Friday, April 30th?

3        MR. WALSH:  Just one moment.  I'm sorry, Your Honor.

4        THE COURT:  Sure?  No problem.

5        MR. WALSH:  That will be fine, Judge.

6        THE COURT:  So I am going to set this for arraignment

7   on Friday, April 30th at 10:00 a.m.

8        Mr. Funk, if there is an indictment before that, let

9   my chambers know and we may make that date sooner, but we'll

10  set it for April 30th at 10:00 a.m.  And in the meantime, I

11  will issue an order based on the hearing today detaining Mr.

12  Bryant and also finding probable cause to move forward with the

13  charges.

14        All right.  If there is nothing else from any party,

15  Mr. Bryant, I wish you the best of luck with handling these

16  charges and I will see you at the end of April.

17        Thank you, everyone.

18        MR. WALSH:  Thank you, Your Honor.  Have a good day.

19        THE COURT:  Good job for the parties.

20        MR. FUNK:  Thank you.

21        THE COURT:  Oh, don't leave.

22        Mr. Funk, are you still here?

23        THE COURTROOM DEPUTY:  Miss Berti (phonetic) is here,

24  Your Honor.

25        MR. FUNK:  Oh, no, I need Mr. Funk because he's the

1  person who needs to hear the Due Protections Act order.  We'll

2  do it on April 30th.

3          THE COURTROOM DEPUTY:  You got it.

4          THE COURT:  All right.  Take care everyone.  Bye.

5          THE COURTROOM DEPUTY:  Thank you, Officer.

6          (Thereupon, the proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                          CERTIFICATE

 3

 4        I hereby certify that the foregoing transcript is an

 5   accurate transcript of the audio recorded proceedings in the

 6   above-entitled matter.

 7

 8

 9

10
     01/02/21                      Bonnie Joy Lewis,
11                        Registered Professional Reporter
                            CASE LAW REPORTING, INC.
12                           7001 Southwest 13 Street,
                            Pembroke Pines, Florida 33023
13                                954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25
```